In the Matter of THE CITY OF NEW YORK, Petitioner, Relative to Acquiring Title to the Elevated Railroad Structure and Appurtenances of the Sixth Avenue Elevated Railroad in Trinity Place and Other Streets in the Borough of Manhattan. BOWERY SAVINGS BANK et al., Claimants.

Supreme Court, Special Term, New York County, June 28, 1943.

Robert H. Schaffer, Acting Corporation Counsel (Alfred D. Jahr, J. Osgood Nichols and Max Berman of counsel), for petitioner.

Richard T. Herrmann for Bowery Savings Bank and other claimants.

Other attorneys for other claimants.

McLaughlin, J. A new trial has been had of this proceeding in accordance with the order of reversal of the Appellate Division. (Matter of City of New York [Sixth Ave. El. R. R.], 265 App. Div. 200.) The trial was divided into two hearings. It was first necessary to determine whether the Sixth Avenue line was capable of profitable operation and if that were found to be the fact then the court was to determine the value of the railroad as a going concern and find the amount of award which should be made. For that purpose a separate hearing was held at which all interested parties were given full opportunity to present proof as to value. Based upon the evidence at that hearing this court made an award in the sum of $12,500,000.

It then became necessary to determine the further question as to the method of distributing the assessments for benefit which would be levied as a result of the award. On that question another separate hearing was had on June 4, 1943. All interested parties were given full opportunity to present evidence as to the method of distributing the assessments.

Pursuant to the provisions of section B15–19.0 of the Administrative Code of the City of New York (L. 1937, ch. 929), which form the basis of determining the assessments for benefit, the court has assessed the various properties in proportion to the amount of the benefits received.

The area to be assessed ran along the route of the Sixth Avenue Elevated Railroad and covered the property 100 feet east and west of the railroad. This area of assessment was determined by the Board of Estimate and is not subject to review by this court. (People ex rel. Schick v. Marvin, 249

App. Div. 293, 296; *Matter of L. I. R. R. Co.* v. *Hylan*, 240 N. Y. 199, 204; *Matter of City of New York* [*Sixth Ave. El. R. R.*], 265 App. Div. 200, 207, *supra.*)

No evidence was presented by the property owners to establish the market value of the various individual parcels in the proceeding. No expert testified to the market value of all the individual parcels affected. Thus there was no proof showing the amount of benefit based upon the market value before the removal of the elevated structure as compared with the market value after its removal. In fact a witness (Wittman) testified that it was too great a task for him to undertake to value all the parcels in the proceeding. Ample opportunity for the presentation of such proof was given all the assessees, but none was produced. The court has determined the benefits in this proceeding based upon a consideration of all the evidence in the proceeding, including documents, maps and other exhibits, together with its viewing of the property both before and after the demolition.

Real estate experts were produced to support the contentions made by the various property owners. These witnesses may be divided into four groups: (1) Those contending that there was no benefit at all; (2) those favoring a distribution of the assessment in proportion to the assessed value of the land; (3) those favoring a zoning method and (4) those advocating the adoption of the front-foot rule.

The position taken by the first group is entirely without merit for the court's view of the premises together with the testimony in the record supports the view that the area from 53rd Street south to Morris Street has been benefited by the removal of the elevated structure.

The inequality which would result from the adoption of the assessed-value method was demonstrated upon the cross-examination of the only witness produced who favored this method, one Edwin Mayer. He stated: " I do not concede that the assessed valuation of the land is the true value, but I adopt it for the purposes of this proceeding."

The witness frankly conceded that the adoption by the court of the land assessed-value method would result in having properties receiving greater benefits paying smaller assessments. Mr. Mayer testified, when examined concerning the demolition of the Second Avenue Elevated at Allen Street, that although the west side of Allen Street received the greater benefit from the removal, the assessments for benefit on that side should be at a lower rate than on the east side because the assessed valuations were lower on the west side. Under the circumstances, it is clear

that the method advocated would violate the statutory requirement that the assessment for benefit be distributed in proportion to the benefits received.

This court has also taken judicial notice of its own decisions and also those of the Appellate Division, First Department, with respect to parcels along the area of this proceeding and they all show that assessments were not only different from real values but that they invariably differ from one another. That clearly is indicated by the following decisions affecting the assessed valuation on some of the benefit parcels in this proceeding.

(Here follow many examples of cases showing that the assessments were incorrect, which are omitted on account of lack of space.)

It would therefore appear that it would be improper to determine assessments for benefit on the basis of assessed values.

Several owners of property favored a method of zoning as testified to by the witness Mr. Keller. He divided the area into fourteen zones, while the other witness as to zoning, Mr. Wittman, fixed eight zones. They did not agree on anything. For instance, Wittman's zone of least benefit, West Third Street, was Keller's zone of greatest benefit. Keller said: "Those properties in that street [W. 3rd St.] are liable for reimprovement, since the 'El' has been taken down. You would never build what they have there again. You would put up a Washington Square type of apartment house". Conversely, Keller's zone of least benefit, properties located on Sixth Avenue between 28th and 29th Streets was Wittman's zone of greatest benefit (Zone 6, at $200 a front foot from 27th to 53rd Street). Clearly, such conflicting testimony could be of no help to the court either in laying out zones or arriving at any proper basis for the fixing of the assessments for benefit.

From an analysis of Keller's testimony the court is left with the task of establishing assessments for every parcel by relying on indefinite terms such as "somewhat", "also", "slight", "little" and "considerably". Such testimony establishes nothing which could possibly aid the court.

Wittman divided the area of assessment into eight zones. The zones were, in effect, according to land values (as determined by Mr. Wittman) with the zone of the least benefit having the lowest land values, the zone of greatest benefit having the highest land values. The witness conceded that he did not try to appraise and allocate a specific amount for every piece of property "because it would be too large a task".

Mr. Wittman's testimony was plainly an effort to have the more valuable parcels in the proceeding receive a greater assessment because of their value rather than because of the benefits conferred by the removal of the elevated railroad. This is clearly shown by the following answer: "A. Somewhere, and in going — in coming to a conclusion as to a stopping place, I have taken into consideration the neighborhood tendencies, the potentialities of that neighborhood, the transit facilities, the sales that took place in the zones and the dollar values they sold for before and after the demolition of the ' El ' structure."

The answer contains practically all bases for fixing value of land and not benefits conferred by reason of the removal of the elevated railroad structure.

This is a benefit assessment which is to be distributed, hence the tax is not to be based upon value of the property but upon the benefits resulting from the improvement. Thus, in *People ex rel. Equitable Life Assur. Soc.* v. *Pierce* (187 App. Div. 437 [4th Dept. 1919], affd. 229 N. Y. 514 [1920]), the court said (p. 441): " In the ordinary assessment roll the tax is laid upon the value of the property assessed. In projects like this the tax is not based upon values at all, but is laid upon the benefits received. The benefits may equal, exceed or be less than the tax itself. The ascertainment of the benefits is for the sole purpose of establishing an equitable and legal ratio of assessment among the landowners. A landowner may have been benefited $1000 and be taxed thereon only ten per cent of that amount. Or he may be benefited $100 and the cost of the improvement may be so large that his tax will be in excess of that amount ".

Several real estate men testified that in their opinion the front-foot rule was the most equitable one. Mr. Morris concluded from his experience and study that the front-foot rule should be adopted. Mr. Hammer likewise testified that the " uniform rate of assessment would arrive at the most equitable approximation of the distribution of benefits "; and Mr. Spear testified that the front-foot rule would be the most equitable. Mr. Wittman who favored the " zone " theory applied the front-foot rule within his established zones.

The legality of assessments by frontage is supported by the decisions. (*People ex rel. Scott* v. *Pitt*, 169 N. Y. 521, 528 [1902]; *Conde* v. *City of Schenectady*, 164 N. Y. 258, 262 [1900]; *O'Reilly* v. *City of Kingston*, 114 N. Y. 439, 448 [1889]; *Matter of Cruger*, 84 N. Y. 619 [1881].) Thus in *People ex rel. Scott* v. *Pitt* (*supra*) the court said (p. 529): " Some other principle might, indeed, operate more fairly upon some particular indi-

vidual, but upon the whole the rule adopted by the legislature in the charter was, perhaps, as fair as any other that could be devised. It has one decided merit that, perhaps, any other rule would not have, and that is that every property owner is required to pay only according to the extent of his possessions, and all are on a basis of equality. It may be that the sewer was a greater benefit to one than to another, but objections of this character could be made whatever principle was adopted.'' (To the same effect see *Genet* v. *City of Brooklyn*, 99 N. Y. 296 [1885]; *Conde* v. *City of Schenectady*, 164 N. Y. 258 [1900], *supra; Spencer* v. *Merchant*, 100 N. Y. 585 [1885], affd. 125 U. S. 345 [1888]; *French* v. *Barber Asphalt Paving Co.*, 181 U. S. 324 [1901]; *People ex rel. Delaware, L. & W. R. R. Co.* v. *Wildy*, 262 N. Y. 109, 111, 112, 114 [1933]; *Matter of City of New York [Juniper Ave.]*, 233 N. Y. 387, 392 [1922]; *Matter of Syracuse, B. & N. Y. R. R. Co.* v. *Van Amburgh*, 223 App. Div. 485 [3rd Dept. 1928], affd. on opinion below, 251 N. Y. 548 [1929]; *People ex rel. Smith* v. *Parker*, 246 App. Div. 674 [3rd Dept. 1935].

In *Donovan* v. *City of Oswego* (90 App. Div. 397 [4th Dept. 1904]), which involved an assessment for paving, the court held that the adoption of a uniform rate per front foot was proper even though property values on some of the blocks were about twenty-three times as great as those on another block on the same street.

All the experts in this proceeding are agreed that it is impossible to set up a perfect method of arriving at assessments for benefit which would make the assessment exactly equal to the amount of benefit received by each parcel. The approach that the court has made in attempting to solve this problem is to follow the admonition of the Appellate Division to the effect that it should take into consideration the many varying circumstances with respect to the physical proximity of the elevated structure to the building lines of the abutting properties, and with respect to the width of the streets and avenues upon which the elevated structure ran, the deprivation of light and air by reason of the existence of the structure and the benefit by restoration of the easement and other factors relative to the proportionate benefit received.

The record shows that the clearance between the elevated structure and the street level is approximately fourteen feet along the entire route of the elevated railroad. The height of the elevated stations runs from approximately 21.4 feet at 53rd Street and Eighth Avenue to 26.8 feet at 14th Street.

The entire acquisition embraces, in the main, sections of two different types. The first type includes that portion of Sixth Avenue running from 3rd Street to 53rd Street. Throughout this section, it is evident from a mere inspection of the Damage Map and a view of the premises that the structure itself was the same, being practically identical in width and height, and was about equally distant from the east and west sides of the building line along the entire avenue.

The second type includes those sections along which the elevated ran, where the structure was much wider, the street narrower and the structure itself in close proximity to the building line, except at Church Street, where a widening on the west side of the street caused a difference, as far as the proximity of the structure between the east side and west side of the street was concerned.

The court, however, has also taken into consideration the fact that in some instances conditions varied somewhat between the separate blocks in these sections. For instance, there are some properties which have been deprived of the transportation facilities which they formerly enjoyed and which have not been restored. This applies to the properties along West Broadway from 3rd Street to Canal Street. Due allowance has been made by the court, in apportioning the assessments for benefit, for the varying conditions as shown in the record.

Considering first the section from 3rd Street to 53rd Street' on Sixth Avenue, it appears that here the street is 100 feet in width; the structure is about 26 feet in width — two tracks — no track walks — leaving a clearance of about 37 feet on both the east and west sides of the street; the columns supporting the structure were in the center of the street. As a proper method of apportioning the assessments for benefit, the court has taken this section as the base or norm and has applied to all properties within this area a constant or base figure of 10. All other parcels insofar as they show a greater or lesser benefit as compared to the parcels in the 3rd Street to 53rd Street section, have been given a figure representing the proper proportion based on the norm of 10, which results in an assessment in proportion to the benefit received on each parcel.

The part of the road not included in the section between 3rd to 53rd Streets may be divided into the following separate sections:

### Trinity Place and Church Street.

From Morris to Dey Streets. The width of the street here was 80 feet. The structure was about 49 feet wide, leaving a

clearance of about 15.6 feet on both the east and west sides of the street. The structure was a three-track one with one cross track and the columns were on the sidewalk. The station at Rector Street was 80 feet in width leaving no space between the structure and the building line. The supporting columns within this area were on the sidewalk. As compared to the base figure of 10 fixed for the section from 3rd Street to 53rd Street the court finds that the assessment for benefit here should be increased. The variance in benefit is fixed for this point at the comparative figure of 12.

### Church Street from Dey to Fulton Streets.

The width of the street varies from about 83 to 87 feet. The structure was a two-track one, 50 to 55 feet wide, leaving a clearance of about 15 feet on each side. The columns supporting the structure were on the sidewalk. The court fixes the comparative assessment figure of 11.5 for this area.

### Church Street from Fulton to Murray Streets.

This section presents a peculiar situation in that the east side of Church Street had the supporting columns on the sidewalk, whereas the west side, which had been widened to the extent of 50 feet had no columns on the sidewalk and the span between the structure and building line was 55 feet. The width of the structure was approximately 20 feet and was within 10 feet of the building line on the east side. The court fixes the following comparative assessment figures: Benefit Parcels (87 to 91 inc.) 12, (92 to 95 inc.) 12, (102 to 104 inc.) 12; Benefit Parcels (77 to 86 inc.) 10, (96 to 101 inc.) 10, (105 to 106 inc.) 10, (154 to 158 inc.) 10. Other Benefit Parcels in this area are assessed on the basis of 12.

### Murray Street.

The width of the street here is 65 feet. The columns were on the sidewalk. The structure was 40 feet in width and had two tracks, leaving a clearance of about 12.6 feet on each side. The court fixes the assessment figure at 12 for this street except for Benefit Parcels (122 to 128 inc.) where the figure is fixed at 10, these parcels being further removed from the structure, some 40 feet instead of 12.6 feet. Benefit Parcel 111 is given a figure of 11.

### West Broadway from Murray Street to Chambers Street.

The street here is 90 feet in width. The structure was approximately 45 feet in width with two tracks and was 15 feet distant from the easterly building line and 30 to 35 feet from the

westerly building line. The court fixes the figure for Benefit Parcels on the east side of the street at 12, and those on the west side at 10.

### West Broadway from Chambers to Reade Streets.

At this point West Broadway forms a plaza on the west side, varying in width from 90 feet to 140 feet. The columns were on the sidewalk on the easterly side and the station and platform were about 12.6 feet from the easterly building line. The court fixes a figure of 12 for Benefit Parcels (194 to 198, inc.) and 10 for Benefit Parcels (171 to 176, inc.); other Benefit Parcels in this area are assessed on basis of 12.

### West Broadway from Reade to Leonard Streets.

The width of the street here is 90 feet and the structure was equally distant (15 feet) from the east and west building lines. There were four tracks with track walks. The width of the structure was about 60 feet. The supporting columns were on the sidewalk. The court fixes the assessment figure for this area at 12.

### West Broadway from Leonard Street to 120 Feet North of Franklin Street.

The width of the street here varies from 90 feet on the south side of Leonard Street to 175 feet on the north end of Franklin Street. On the easterly side the columns supporting the structure were on the sidewalk and the structure itself was within 20 feet of the building line. The westerly side of the street formed a plaza. The four tracks of the structure extended to a distance of 50 feet north of Leonard Street and then the line became a two-track system. The center had a clearing space of 30 feet. The court fixes the comparative assessment figure at 12 for Benefit Parcels (240 to 250, inc.) and 10 for Benefit Parcels (256 to 261, inc.); other parcels in this area are assessed on basis of 12.

### West Broadway from Franklin Street to the South Side of Canal Street.

The width of the street here is 90 feet. The structure was 60 feet in width and was 15 feet distant from east and west building lines. A clearance of 30 feet remained in the center. The court fixes a figure of 11 for this area except for Benefit Parcels (297 to 300, inc.) where the figure is fixed at 10.

### West Broadway from North Side of Canal Street to South Side of Prince Street.

The street here is 70 feet wide. The structure was about 40 feet in width with two tracks, leaving 15 feet between the

structure and the east and west building lines. The columns were on the sidewalk and the spacing of columns was approximately 40 feet (the usual column placement elsewhere was 50 feet). The court fixes a figure of 11 for this area. It has taken into consideration in this area the loss of transit facilities.

### North Side of Prince Street to West 3rd Street.

The situation here is the same as from Canal Street to the south side of Prince Street, except that the loss of transit facilities is greater by reason of the comparative inaccessibility of this area to present transit facilities. The assessment figure for this portion is therefore fixed at 10.5.

### West 3rd Street.

The street here is only 50 feet wide. The structure is 35 feet in width, leaving a distance of only about 8 feet on each side from the building line. The columns were on the sidewalk and about 40 feet apart. The court fixes the figure at 12 except for Benefit Parcels (563 to 567, inc.) where the figure is 10. Benefit Parcels (657 to 663, inc.) are also fixed at 10.

### West 53rd Street.

The street here is 60 feet in width. The structure was about 35 feet in width, leaving a distance of 12.6 feet from the building line on each side. The columns were on the sidewalk and spaced about 40 feet apart. There were cross-overs between Broadway and Eighth Avenue and in portions between Eighth and Ninth Avenues. The court fixes the benefit assessment at 12 for this area.

While those parcels (in the sections other than that from 3rd Street to 53rd Street) which are located close to stations have received greater benefit because of the improvement in light and air conditions, nevertheless, that greater benefit has been neutralized by the loss of proximity to the stations.

The assessments for Benefit Parcels (1372 to 1375 inc. and 1383 to 1389 inc.) must be treated separately since they were assessed previously in the Sixth Avenue Spur case. These parcels are located on Sixth Avenue, and therefore the assessment unit is 10. However, whatever assessment is arrived at on that basis will then be reduced on these parcels by 30%.

The motion to distribute one third of the cost of the structure on the City is denied.

Let the Corporation Counsel compute the assessments and submit a tentative decree.